Guy A. Graves, J.
This trial arose from flood conditions which occurred on the morning of August 28, 1971. The plaintiffs allege they incurred damages through the negligence of the City of Schenectady. By stipulation of counsel, only the question of liability was at issue in this trial.
I. FINDINGS OF FACT
During the night of August '27 to 28, a steady rain had fallen in the City of Schenectady. At about 9 :00 a.m, on the 28th, water flowing from continued rainfall in the streets in the lower Broadway area and Broadway area of the city, began to rise slowly; shortly thereafter a manhole cover over a large drain, just to the right of Senecal’s gas station on Broadway, opposite where lower Broadway or Broadway Place intersects, shot up high into the air, the pavement heaved and a large *483 volume of water and debris cascaded down lower Broadway, which is a dead-end street blocked by the D & H Railroad embankment (access to General Electric Company through the embankment is available through a tunnel known as the Subway). A heavy flow from this source continued through the morning and early afternoon, resulting in a flood in the lower portions of the area, deep enough, for example, to reach the seats of parked cars, to cover steps in the Subway, to inundate cellars and lower stages of affected buildings, and to necessitate the use of a rowboat to get about.
Testimony of city employees and area residents clearly established the direct cause of the flood, viz., the bursting of the Fuller Pond Dam and consequent overflow from a heavy and immediate gush of water into the drainpipe and out of the manhole. A description of the structure and operation of this drainage system is essential to a determination of the liability issue:
The manhole (known as No. 1) near Broadway from which the flood erupted provided a by-pass for maintenance inspection of the drainpipe leading from a municipally owned and operated cofferdam holding back a small body, of water known locally as Fuller Pond.
Built between 1985 and 1936, the dam had a concrete and steel base with grates on top to bar rubbish or debris from going down the sewer. Over the base, a wooden box-like structure made of .2 inches by 6 inches uprights and 13 inches ship-lap attached to concrete by steel pipe posts and uncovered on top, had been erected to an additional height of about 5 feet. This, of course, enabled the pond water to rise proportionately higher before going over the edge and down the grates into the drainpipe. In addition, the concrete part contained a stem-operated valve which could be closed or opened by degrees to regulate flow into the drain.
For the plaintiff, the retired city Supervisor of Sewers with 36 years’ experience testified that he understood the wooden structure was originally considered to be temporary and that a house was supposed to have been built to cover the dam; that this plan was set aside and the cofferdam was placed in operation. The cofferdam operated by itself under “ normal ” conditions, so to speak, but had to be inspected every week to see if floating debris such as waste, wood, tires, and other junk had obstructed the grates.
*484 ¡The valve was designed to be used depending on conditions: If drainage below was flowing properly, the valve would be opened up and water allowed to flow through so no damage below would occur; if needed to ,be closed or adjusted to moderate flow, it would be so closed. For example, if water reached near the top of the wood barrier, the valve usually would be opened to relieve pressure. He further testified that if conditions were unusual because of heavier rain fall, the dam would be checked, debris removed, and the valve position tended to (italics supplied).
Debris would be removed on regular inspection and ordinary maintenance repairs were made on wood- structure by city carpenters. His testimony indicated that in 36 years, although weakened and repaired from time to time, the dam had never collapsed; also, that debris had become a problem because of dumping by contractors and residents in the Fuller Pond area. The Supervisor, who retired in September, 1969 was followed on the stand by an assistant who retired in March, 1970 and who generally corroborated this version of the structure and its operation.
Further details concerning the drainage system were obtained from an expert witness, a licensed civil engineer, whose investigation on behalf of claimants revealed the following: The metal grate protected a 30-inch inlet pipe into a concrete flume which went into the main drain, a 90-inch pipe which in turn. traversed private property in a northerly direction bending and turning at points, usually concrete boxes, some of which would not allow a flow equal to that of a 90-inch pipe. For example, at the Senecal station manhole, the 42 inch by 84 inch concrete box, reduced flow to 105 cubic feet per second, rather than the standard 500 cubic feet per second capacity of 90-inch pipe. The grade from dam to manhole was 3.2% with a total drop of 24.5 feet in a distance of 790 feet. At various points along the drain, additional drainage from the tributary area entered the pipe from catch basins and connecting storm sewers. He further testified that the cofferdam was inadequate and was unlike any that he had seen in his years of experience. He stated that upon its failure, a tremendous increase of flow . río the drainage pipe occurred, creating an explosive effect, ¡with stresses at manhole and pipe constrictions amounting to what is known as a “ water hammer ?
His expert opinion as to the prime technical causes of the drainage system collapse included the following:
*485 1. Failure of poorly designed, constructed and maintained “ weathered ” wood dam, 36 years old, to retain water draining from a 1,700 acre drainage area, during a very heavy rainfall. Examination of the remaining structure two days after the collapse revealed rotten, waterlogged wood.
2. Insufficient capacity of drain pipe at and beyond Seneeal station, causing a buildup of hydraulic pressure.
3. Failure of manholes without lock covers and concrete boxes to resist uplift forces and allowing water to be ejected.
' In short, excessive water pressure caused cc ' ipse of a total drainage structure not built or designed to mthstand such pressure.
Weather reports received in evidence indicated the rainfall had been ‘ ‘ unusual ’ In period of August 27 to 28, 1971, 4.46 inches fell: 1.42 inches on August :27, 3.04 inches on August. 28, On September 11 and 12, 1960, almost 11 years earlier, 4.86 inches had fallen and the dam had held and the witness admitted the system had apparently performed then but this was relevant to the instant case only depending on all other conditions being the same.
Plaintiffs presented additional witnesses, one a city employee, the other operating a business on a plot abutting the dam site and owning Fuller Pond, who testified that in the early morning of August 28, 1971, alarmed by the condition of the dam, they had called City Hall for help. One witness testified to three calls during one of which he allegedly was advised by the city Superintendent of Streets and Sewers that there were flood conditions all over the city. In any event, the appeals and warnings that morning were not responded to until several hours after the flood. These witnesses also referred to the rotten, weakened condition of some of the wood in the cofferdam.
The Supervisor of Sewers since 1969, in testifying on behalf of the city, indicated the city’s practice was to check the dam at least once a week. Indeed, the dam had been inspected and monitored according to his records, not only on the 27th of August, 1971 but on August 23, August 9 and the 3rd and 4th of August. Nothing wrong with the wooden part of dam was reported and all was in working order. This witness testified that he saw the gate was one-half open on August 23 and that as a matter of fact, it was always like that, always left in the one-half open position except when repairs to drain were necessary. He further testified that in his work experience, the valve was never adjusted to let water out, nor was he ever directed *486 to do so. In this connection, it should be noted that another defense witness, the City Engineer, later stated that in his opinion, the purpose of valve was threefold: (1) repairs; (2) to facilitate removal of debris caught in intake; (3) and to regulate flow of water. This witness stated he had inspected the structure on numerous occasions, including July, 1971, had seen no rot or weakness in the wooden structure, noted that it always functioned adequately during rainfall and believed the dam was the same dam as the original one, except for necessary repairs. He had no specifications or plans of structure on file, nor did he know if it had been designed by an engineer.
Neither witness could recall any notice or warning of a dangerous situation at the dam on August 28, 1971. Several other defense witnesses generally testified in corroboration of this version of the structure and situation. Some testimony was offered regarding changes over the 36 years in the drainage area.
Several subdivisions had been built contiguous to the drainage area and an indefinite volume of storm water flowed therefrom; also there was reference to the persistent practice of dumping construction debris and refuse in the pond area.
In addition, though no direct proof was available, the amount of debris washed through the system suggested the probability of obstructions in the drainage contributing to the backup and explosive effect of the increased volume of water resulting from the drain’s collapse. It may be noted here that an examination of this dam after the collapse revealed the grate in the cement was missing. No testimony clarified the question of where or how it was removed, except that defendant’s witness testified that prior to the August 27 to 28 rain, the city’s inspection did not indicate its absence.
Under these circumstances and conditions, is there a basis for finding the city liable in negligence and responsible in damages to the claimants?
n. POINTS OF LAW
The pertinent points of law applicable to this case are as follows:
A. The weight of authority upholds the position that a municipality is not liable for the adoption of a drainage plan or system which proves inadequate, defective or insufficient. (See Seifert v. City of Brooklyn, 101 N. Y. 136; Paine v. Trustees and Inhabitants of Vil. of Delhi, 116 N. Y. 224; 38 Am. Jur., *487 Municipal Corporations, § 634.) However, the municipality if aware of the system’s inadequacy and that injury may result, is constrained to exercise ordinary care to prevent such a consequence and is liable for failure to do so. (See 40 N. Y. Jur., Municipal Corporations, § 1024.)
If the construction of a sewer or a drainage system was sufficient for its original purposes, but later became inadequate or overtaxed because of a change in conditions created by additional connections or change in street grade, a municipality has been held liable. (Seifert v. City of Brooklyn, supra.)
B. Maintenance and repair. It is well established that a municipality has no immunity from suit where it controls and manages a drainage or sewer system; it has a duty to use reasonable diligence and care to keep the system in good repair, and is liable in damages to any property owner injured by its negligence in this respect. (Paine v. Trustees and Inhabitants of Vil. of Delhi, supra; Randle v. City of Rome, 23 Misc 2d 436.)
This duty includes not only the necessity of a reasonable degree of watchfulness in checking the condition of the structúres, but also in. checking and clearing obstructions caused by debris, changes in the condition and use of the drainage area, etc.
In short, a municipality has the obligation to keep the drains in' good repair and free from obstruction and is liable for negligence in performing this duty. (See 40 N. Y. Jur., Municipal Corporations, § 1027 and numerous citations thereunder.)
G. Unusual and extraordinary rainfall. When an unusual or extraordinary rainfall is involved, the authorities show some conflict of opinion.
Numerous decisions in other jurisdictions have held the municipality is not relieved from liability if the damage would not have resulted but for the obstruction or if the obstruction contributed to the injury. (See Ann. 59 ALR 2d 324, § 19.)
If, however, the damage resulted from the unusual rainfall and would have resulted had there been no obstruction, the municipality has been held not liable, notwithstanding its negligence in allowing the obstruction to exist. In "New York State, this view was expressed in Smith v. Mayor etc., of City of N. Y. (66 N. Y. 295); O’Donnell v. City of Syracuse (184 N. Y. 1).
D. Notice. In New York State, the decisions have split as to whether notice, actual or constructive, is a condition precedent to a finding of liability.
*488 On the one hand, some New York cases have held that the municipality must have actual , or constructive notice. (Smith v. Mayor, etc., of City of N. Y., 66 N. Y. 295, supra; Schreiber v. Mayor, etc., of New York, 11 Misc. 551; Judas v. City of New York, 55 Misc. 259.)
On the other hand, several New York eases decided in about the same period stressed the duty of a municipality to inspect, be watchful and to remove obstructions, and eliminated the necessity of actual notice as a defense. (Barton v. City of Syracuse, 36 N. Y. 54; McCarthy v. City of Syracuse, 46 N. Y. 194; Talcott v. City of New York, 58 App. Div. 514.)
Of course, liability can arise, where it is shown a municipality had actual or constructive notice, except where it is shown that the damages resulted from a dangerous condition that suddenly arose in connection with use and operation of the drains so that the municipality had no opportunity to have either actual or constructive notice. (Watson v. City of Kingston, 114 N. Y. 88; Beyer v. City of New York, 141 App. Div. 679; Schreiber v. Mayor etc., of New York, supra.)
III. CONCLUSIONS
As to the above points of law, the following conclusions ensue:
point a. The evidence indicates that originally the drainage system as designed and constructed was inadequate, although for 36 years up to the time of the flood it operated in a manner sufficient to prevent a flood below. The design and construction of the wooden cofferdam was “ unusual ” and flimsy; moreover, the corner concrete boxes in the drain below, in effect choking the ordinary flow of a 90-inch pipe, established the basis for a potential obstruction which might be caused both by debris or an overage of water flow.
In addition, there is evidence the municipality did not take into consideration the factors of increased inflow into the pond from contiguous subdivisions built in the interim; nor the persistent dumping of debris into the drainage basins. These factors, properly watched and attended to would mandate either the construction of an improved retaining dam and drainage system enforcement of dumping restrictions or increased attention at least to the operation of the existing dam and in particular the valves regulating flow.
On this point, the municipality had failed in later years and at the time of the flood to meet its duty to the residents of the area, although the court agrees that in the first instance and in general the municipality could not be held liable for errors of judgment in the design of the drainage system.
*489 point b. The weight of1 evidence indicates the city carried on reasonably regular inspection visits to the system. -Debris was removed on a regular basis apparently; repairs of a kind to the wooden structure were made on occasion. When rainfall was heavy or “ unusual ” it appears that, prior to 1971, among other steps the outlet valve was adjusted to regulate water flow. At the time of the flood, it is uncontested, the practice was to leave the valve one-half open. -No evidence of any adjustments of the valve during the 1971 flood was offered; indeed, it is admitted the later practice was to leave the outlet valve half open. In 1960, the system was adequate despite a comparable deluge. In 1971, it failed. The water flow factor and the practice of the city not to attempt a regulation thereof cannot be ignored as a contributing cause of the excess pressure on the wooden coffer and its subsequent failure in 197-1. The city’s operation of the system was inadequate. Moreover, despite the inspections and occasional carpentry, the credible evidence indicates the cofferdam’s wooden structure had become weathered, waterlogged in part, and generally weakened. A more thorough inspection surely would have revealed this condition so that repair and adequate maintenance could be effected.
On this point of law, the city failed to meet its duty to properly operate the drainage system and was negligent in its maintenance.
point o. In view of the 1960 rainfall, it cannot be said that a comparable situation might not arise subsequently. Although it can be argued that if the system held in 1960, that fact should prevail and the city could not be expected to reasonably foresee a collapse in the future, the proper conclusion is that the city could not be held liable if conditions were similar, i.e. for example, the wooden structure had been adequately repaired and maintained, the valve-water flow regulated, the dumping of debris restricted and the new housing developments with additional storm flowage and grade changes, etc. compensated for.
There is no evidence that such factors, reasonably apparent to the municipality, were adequately taken into consideration in the system’s operation.
Accordingly, the storm of August 27 to 28, 1971 was not such an act of God, so to speak, sufficient to relieve the municipality of liability for any negligence in the operation and maintenance of the system under its sole control.
*490 point u. In this ease, even if a charitable view might- constrain one to say that since the system had not failed in 36 years, there was no constructive notice, a closer attention to the situation would indicate that the city was or should have been aware of1 the system’s inadequacies and requirements (referred to supra) and had adopted a “ crossed finger ” attitude toward it. "Whether it hoped for the best, viz. ordinary rainfall and maintenance, the possibility if not the probabilities under ascertainable weather prediction conditions, should have provided constructive notice of possible failure of an old and inadequately constructed structure.
It must be noted, moreover, that actual notice of the danger was given by several citizens prior to the collapse. Indeed, the owner of the Fuller Pond testified that several years prior to 1971 he had attempted to alert the city to the risks of the situation and also had called city officials at the time of the August, 1971 storm to seek help in the immediate case. As to the wooden coffer actually failing, etc., the actual notice may be short, but the totality of the various notices is such that the defendant cannot be excused.
Even though there has been a city wide “ emergency ” caused by heavy rainfall, the municipality has been held liable on short notice of potential dangers. (Sotel v. City of New York, 81 Misc. 344.)
On the facts and the law, defendant City of Schenectady is found liable and should respond in damages to the claimants for its negligence in the operation and maintenance of the subject drainage system.